IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:15-CV-00193-RN

**Ava Gnann Willis,**

                Plaintiff,

v.

**Nancy A. Berryhill**, Acting Commissioner of Social Security,[1]

                Defendant.

**Memorandum & Order**

Plaintiff Ava Gnann Willis instituted this action on December 21, 2015, to challenge the denial of her application for social security income. Willis claims that the Administrative Law Judge ("ALJ") Christopher Willis erred in formulating the residual functional capacity ("RFC") and in weighing the medical opinion evidence. Both Willis and Defendant Nancy Berryhill, the Acting Commissioner of Social Security, have filed motions seeking a judgment on the pleadings in their favor. D.E. 20, 22.

After reviewing the parties' arguments, the court has determined that ALJ Willis erred in his determination. ALJ Willis failed to properly evaluate the medical opinion offered by the psychological consultative examiner. Additionally, substantial evidence does not support ALJ Willis's RFC finding as it relates to Willis's shoulder pathologies and carpal tunnel syndrome

---

[1] Berryhill replaced Carolyn Colvin as the Acting Commissioner of Social Security on January 20, 2017.

("CTS"). Therefore, the undersigned magistrate judge grants Willis's motion, denies Berryhill's motion, and remands this matter to the Commissioner for further consideration.[2]

I.   Background

On November 19, 2010, Willis filed applications for disability benefits and supplemental security income. In both applications, Willis alleged a disability that began on October 1, 2010. After her claims were denied at the initial level and upon reconsideration, Willis appeared at a hearing before an ALJ Willis on July 17, 2014, to determine whether she was entitled to benefits. ALJ Willis determined Willis was not entitled to benefits because she was not disabled. *Id.* at 19–34.

ALJ Willis found that Willis had the following severe impairments: coronary artery disease ("CAD"), lumbar degenerative disc disease, CTS, anemia, arthritis, obesity, rotator cuff syndrome, bilateral plantar fasciitis, major depressive disorder, bipolar disorder, obsessive compulsive disorder ("OCD")/eating disorder, history of attention deficit hyperactivity disorder ("ADHD"), generalized anxiety disorder, and panic attacks. *Id.* at 22. ALJ Willis found that Willis's impairments, alone or in combination, did not meet or equal a Listing impairment. *Id.* He then determined that Willis had the RFC to perform light work with limitations. *Id.* at 25. She is limited to frequent use of the bilateral upper extremities for reaching, pushing, pulling, operating hand controls, handling, fingering, and/or feeling. *Id.* Willis must never climb ladders, ropes, or scaffolds. *Id.* She must avoid concentrated exposure to temperature extremes of heat and to pulmonary irritants, such as fumes, odors, dust, gases, poor ventilation, and the like. *Id.* She must also avoid concentrated exposure to workplace hazards such as dangerous moving machinery and unprotected heights. *Id.* Willis can understand and perform simple, routine,

---

[2] The parties have consented to jurisdiction by a United States Magistrate Judge. 28 U.S.C. § 636(c). D.E. 25.

repetitive tasks and can stay on task for two-hour periods over a typical eight-hour workday, as required to perform such tasks. *Id.* She requires a low-stress setting that is further defined to mean no production-pace or quota-pace work but rather a goal-oriented job primarily dealing with things as opposed to people. *Id.* She can have no more than occasional changes in the work setting. *Id.* Willis is limited to no more than occasional social interaction with supervisors and coworkers. Finally, she cannot work with the public as a component of the job, such as sales or negotiations, though incidental or casual contact as it may arise in the workday is not precluded. *Id.*

ALJ Willis concluded that Willis was unable to perform any past relevant work but that considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Willis is capable of performing. *Id.* at 32–33. These jobs included: cleaner/housekeeper, office helper, and advertising material distributer. *Id.* at 34. Thus, ALJ Willis found that Willis was not disabled. *Id.*

After unsuccessfully seeking review by the Appeals Council, Willis commenced this action on December 21, 2015. D.E. 6.

## II. Analysis

### A. Standard for Review of the Acting Commissioner's Final Decision

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B. Standard for Evaluating Disability

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson* v. *Barnhart*, 434 F.3d 650 (4th Cir. 2005). The analysis requires the ALJ to consider the following enumerated factors sequentially. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. At step two, the claim is denied if the claimant does not have a severe impairment or combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment, the ALJ assesses the claimant's RFC to determine, at step four, whether he can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C. Medical Background

Willis has a significant medical history. She has suffered from upper extremity neuropathy since 2009. In May 2009, Willis had a nerve conduction study ("NCS") which revealed severe right median neuropathy at her right wrist and mild median neuropathy on her left side. Tr. at 516. Providers diagnosed CTS. *Id.* at 230, 233.

Willis underwent stenting surgery following a heart attack in October 2010. *Id.* at 247, 265. Willis reported intermittent chest pain and fatigue in follow-up visits. *Id.* at 243, 271, 279, 284. Willis presented to the Emergency Department in February 2011 for chest pain and dizziness. *Id.* at 294. Providers continued her assessments of CAD and angina. *Id.* at 300. Willis continued to experience shoulder pain and, upon examination, the area was tender to palpitation. *Id.* at 519–21, 527. Her primary care providers noted that her shoulder pain was affecting her ability perform activities of daily living. *Id.* at 528.

A July 2011 MRI of Willis's left shoulder revealed subacromial narrowing and fairly pronounced tendonitis in the supraspinatus and insertion, as well as thickening and edema along with potential adhesive capsulitis. *Id.* at 417. The following month, Willis reported that she was unable to write or hold a cup without pain. *Id.* at 469. She stated she had severe right hand pain and that her shoulder pain was 7/10. *Id.* Examination revealed pain with range of motion ("ROM"), positive impingement signs in her left shoulder, and tenderness with decreased sensation in her right hand. *Id.* at 470. An x-ray of her left shoulder disclosed significant acromioclavicular ("AC") joint degenerative disc disease with inferior spur formation at the distal clavicle as well as a type III acromion suggesting impingement. *Id.* Providers diagnosed CTS and shoulder impingement with rotator cuff tendinopathy. *Id.*

In August 2011, Willis had CTS release surgery on her right wrist which provided some improvement in the numbness and tingling she experienced. *Id.* at 472. She again reported left should pain in October 2011. *Id.* at 476–77. Willis attended physical therapy to address her conditions. *Id.* at 567–621. After two months of physical therapy, her providers noted that Willis showed some improvement in strength but continued to demonstrate weak grip in her right hand and tenderness and decreased ROM with marked pain in her right shoulder. *Id.* at 523, 525.

5

Willis reported resolution of her shoulder pain in January 2012. *Id.* at 480. However, Willis returned to her orthopedist in March 2012 complaining of worsening left shoulder pain which radiated through her arm and neck. *Id.* at 482–83. Providers diagnosed rotator cuff tendinopathy and left shoulder impingement, and suggested her next course of action may be surgery as PT and injections had failed to provide long-lasting relief. *Id.* In August 2012, Willis continued to demonstrate positive impingement signs upon examination. *Id.* at 484–85.

In March 2013, Willis sought care for significant numbness and tingling in her right wrist. *Id.* at 486–87. Despite her previous CTS release surgery, Willis experienced sensory disturbance which was present with even light activity. *Id.* Providers suspected she may have sustained chronic, long-term damage to her median nerve. *Id.* at 487. She also reported continued pain in her left shoulder, and an x-ray showed moderate AC joint damage. *Id.* The following month, an upper extremity nerve conduction study ("NCS") showed bilateral median neuropathy, that was severe on the right side and moderate on the left side. *Id.* at 555–59. Providers noted that her right side "may reflect chronic remnant changes" and that she had problems with left shoulder ROM during testing. *Id.*

In May 2013, Willis sought follow-up care for her bilateral wrist pain. *Id.* at 488. On exam, she displayed numbness and tingling consistent with median neuropathy. *Id.* at 488. Providers assessed bilateral CTS and recommended release surgery for her left wrist. *Id.* Treatment notes also reflect that Willis had severe median neuropathy on the right, which providers opined was primarily chronic nerve damage for which surgery would be of little benefit. *Id.* at 489.

In September 2013, Willis complained of decreased mobility, joint tenderness, and weakness in her shoulders. *Id.* at 561. Providers assessed a rotator cuff tear on the left side. *Id* at

6

563. In October 2013, she continued to experience shoulder pain and displayed impingement signs on the right side, weakness with rotation, and pain with ROM. *Id.* at 672–73. Providers diagnosed traumatic rotator cuff tear. *Id.* at 614. Willis underwent additional physical therapy in November 2013. *Id.* at 590–607. Providers noted her limited function with the right upper extremity and observed that her persistent shoulder pain kept her from tolerating the progression of treatment. *Id.* at 590, 607. A follow-up appointment in January 2014 noted the same objective signs displayed in October and providers again assessed her condition as a traumatic rotator cuff tear. *Id.* at 668, 670–71. Willis continued to receive follow-up treatment for chest pain, CAD, and foot pain throughout 2014. *Id.* at 622, 626–27, 759, 761.

Dr. Thomas Stack performed a psychological consultative examination on January 5, 2011. *Id.* at 290–92. He noted that Willis cried often, was irritable, and had only fair attention. *Id.* Dr. Stack opined that her intelligence was below average and she displayed OCD symptomology. *Id.* He diagnosed Willis with major depressive disorder and bipolar disorder (provisional). *Id.* Dr. Stack opined that Willis was able to understand, retain, and follow instructions at times but that she would be unable to sustain attention to perform simple, routine, repetitive tasks as he believed she may have ADHD. *Id.* He further concluded that Willis would be unable to relate to others due to her irritability and depression and that she could not handle the stress of day-to-day work. *Id.*

In January 2012, Dr. Stack performed a second psychological consultation. *Id.* at 447–50. He noted that the mental status exam indicated Willis was overwhelmed and irritable. *Id.* at 448. He remarked that she had only fair attention and concentration and her memory was not good. *Id.* at 449. Dr. Stack found Willis had a poor prognosis and diagnosed major depressive disorder that was moderate, bipolar disorder (provisional), OCD, and generalized anxiety disorder ("GAD").

7

*Id.* Dr. Stack opined that Willis could understand, retain, and follow instructions but not for an extended period of time. *Id.* He further found that she could not sustain attention to perform simple, routine, repetitive tasks and she may have ADHD. *Id.* He remarked that Willis could not relate to others due to depression, moodiness, and irritability. *Id.* Dr. Stack also concluded that, due to medical and psychiatric problems, Willis would be unable to handle the stress of day-to-day work activities. *Id.*

State agency reviewer Dr. Sylvia Skoll offered a mental residual functional capacity assessment on January 26, 2011. *Id.* at 44–46, 792–94. She found that Willis could understand, remember, and follow simple instructions; she was able to sustain attention to complete a variety of tasks for two-hour periods at a non-production pace; she could complete a normal workweek; she accept direction from supervisors; she could maintain adequate relationships with coworkers with minimal social interaction requirements and only casual public contact; and she could adapt to simple changes. *Id.*

Dr. Marcelo R. Perez-Montes performed a consultative exam on December 28, 2011. *Id.* at 442–45. He noted normal grip strength and extremity strength with no muscle atrophy. *Id.* at 443. He did not offer an assessment as to Willis's functional capabilities. *Id.* at 442–45.

State agency reviewer Dr. Hari Kuncha offered an assessment on February 9, 2011. *Id.* at 42–44, 790–92. Dr. Kuncha opined that Willis was capable of light work. *Id.* On February 1, 2012, state agency reviewer Dr. Dakota Cox similarly found that Willis could perform the lifting and carrying requirements associated with light work. *Id.* On that same date, State agency psychological reviewer Dr. Daniel Nelson endorsed Dr. Skoll's findings as to Willis's mental abilities. *Id.* at 62–64.

### D. Medical Opinion Evidence

Willis asserts that ALJ Willis erred in weighing the opinions of the psychological consultant. Specifically, she contends that ALJ Willis failed to accord sufficient weight to Dr. Stack's findings, despite the fact that he was the only medical provider to perform psychological evaluations of Willis during the relevant period and his opinions were consistent with the other evidence of record. The Commissioner maintains that substantial evidence supports ALJ Willis's consideration of this expert evidence. The court finds that ALJ Willis failed to provide a rational basis for discounting Dr. Stack's findings.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). While an ALJ is under no obligation to accept any medical opinion, *see Wireman* v. *Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006), he must nevertheless explain the weight accorded such opinions. *See* SSR 96–2p, 1996 WL 374188, at *5 (July 2, 1996); SSR 96–6p, 1996 WL 374180, at *1 (July 2, 1996). When evaluating medical opinions, the ALJ should consider "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," *Scivally* v. *Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion, *see* 20 C.F.R. § 404.1527(c). Generally, the more the medical source presents relevant evidence to support his opinion, and the better that he explains it, the more weight his

9

opinion is given. *See id.* § 404.1527(c)(3). Additionally, the more consistent the opinion is with the record as a whole, the more weight the ALJ will give to it. *See id.* § 404.1527(c)(4).

According to 20 C.F.R. § 404.1527(c)(2), a treating source's opinion on issues of the nature and severity of the impairments will be given controlling weight when well supported by medically acceptable clinical and laboratory diagnostic techniques and when the opinion is consistent with the other substantial evidence in the record. Conversely, however, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro* v. *Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see also Craig* v. *Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding that "if a physician's opinion in not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight"). A medical expert's opinion as to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ and for the ALJ alone. *See* 20 C.F.R. § 404.1527(d)(1).

As Willis points out, Dr. Stack conducted two consultative examinations, approximately 13 months apart. His observations, diagnoses, and assessments in both examinations are consistent. Dr. Stack opined that Willis could understand, retain, and follow instructions at times but not for an extended period of time, that she would be unable perform simple, routine, repetitive tasks, that would be unable to relate to others and that she could not handle the stress of day-to-day work. ALJ Willis did not credit these findings in formulating the RFC and afforded Dr. Stacks's opinions only partial weight. Tr. at 31. He cited Willis's lack of mental health treatment, including ER or hospital care for mental health symptoms. *Id.* at 32.

Frequent medical visits "generally lend support to an individual's allegations of intense and persistent symptoms." SSR 96–7p, 1996 WL 374186, at *7 (July 2, 1996). However:

the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

*Id.*[3] At the hearing, ALJ Willis inquired into Willis's lack of mental health intervention. Tr. at 855. Willis, who was pro se at the hearing, noted that she had managed her mental health symptoms for a number of years when she was doing better than she was at the time of the hearing. *Id.* at 858.

The inquiry into Willis's reasons for not seeking additional mental health treatment was cursory. ALJ Willis's either overlooked, or simply ignored, other evidence in the record that supports both Willis's stated limitations and Dr. Stack's assessed limitations caused by her mental conditions. Such evidence included the fact that Willis obtained medications for her anxiety and depression from her primary care provider. She noted becoming stressed and angered and that medications failed to remedy these issues. *Id.* at 858–59. She also remarked that she has problems with attention and learning. *Id.* at 872. ALJ Willis noted she took Xanax for anxiety and Effexor for depression, she reported that the stress and pressure of her cashier job

---

[3] Subsequent to the ALJ's decision, the Social Security Administration superseded SSR 96-7p with SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). Because SSR 96-7p was in effect at the time the ALJ's decision, the undersigned will review the decision under SSR 96-7p. *See Keefer v. Colvin*, C/A No. 1:15-4738-SVH2016 WL 5539516, at *11 n.5 (D.S.C. Sept. 30, 2016). Nonetheless, the court observed that the more recent Ruling provides that the SSA may consider certain factors in a claimant's treatment history, including:
- An individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her symptoms
- Due to various limitations (such as language or mental limitations), an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment.
- Due to a mental impairment (for example, individuals with mental impairments that affect judgment, reality testing, or orientation), an individual may not be aware that he or she has a disorder that requires treatment.

was unmanageable, and records noted obsessive compulsive behavior, irritability, depression, moodiness, and an eating disorder. *Id.* at 856–57, 860.

ALJ Willis observed that North Carolina Department of Health and Human Services approved Willis's disability application. *Id.* at 32. He noted that that agency found that Willis's non-exertional mental impairments, including irritability, decreased attention and concentration, impaired judgment, and estimated low average intellect rendered her unemployable. *Id.* ALJ Willis discounted this agency finding. *Id.* He noted the same criteria are employed for such disability determinations but stated the evidence upon which the decision was based was unclear. *Id.*

ALJ Willis instead focused his consideration of Willis's mental health on a lack of treatment. However, a lack of treatment for an impairment does not necessarily mean that the impairment does not exist or impose functional limitations. *See Grotendorst* v. *Astrue*, 370 F. App'x. 879, 883 (10th Cir. Mar. 22, 2010). Although the amount of treatment a claimant has pursued is an "important indicator" of the intensity and persistence of a claimant's symptoms, *see* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), failure to seek mental health treatment is not an appropriate reason to discount a claimant's own testimony about mental health symptoms, let alone a physician's diagnosis. *See Van Nguyen* v. *Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (noting that those with depression often do not recognize their condition reflects potentially serious mental illness); *see also Blankenship* v. *Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989) (holding invalid ALJ's rejection of claimant's assertions regarding his depression due to failure to seek psychiatric treatment, finding questionable practice of chastising one with mental impairment for exercise of poor judgment in seeking rehabilitation).

12

Case 4:15-cv-00193-RN   Document 27   Filed 03/14/17   Page 12 of 20

ALJ Willis did not sufficiently examine the reasons why Willis did not seek treatment from a mental health professional. Given Willis's pro se status, ALJ Willis should have explored this issue in more detail to develop a complete record of why Willis did not seek additional mental health treatment. *See Crider* v. *Harris*, 624 F.2d 15, 16 (4th Cir. 1980) (an unrepresented claimant is entitled to the sympathetic assistance of the ALJ to develop the record). Furthermore, neither ALJ Willis nor the Commissioner has provided an explanation why Willis's lack of mental health treatment treatment would provide a clear and convincing reason to discredit Dr. Stark's opinions. *See Van Nguyen*, 100 F.3d at 1465 ("[T]he fact that claimant may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that [a physician's] assessment of claimant's condition is inaccurate."); *Stallings* v. *Colvin*, No. 4:14-cv-60-FL, 2015 WL 4480352, at *9 (E.D.N.C. Jul. 21, 2015) (remanding where it was unclear whether ALJ gave the requisite consideration to claimant's proffered reason for failing to seek treatment regarding her mental health issues, which impacted the ALJ's evaluation of the sole opinion from a mental health expert); *Hansel* v. *Colvin*, No. C13–5511BHS, 2014 WL 2198807, at *4 (W.D. Wash. May 27, 2014) (noting that those afflicted with depression, and many other mental illnesses, may not recognize the need for treatment).

In sum, ALJ Willis failed to ascertain the reasons why Willis did not pursue further mental health treatment. The court is unable to conclude that Willis lacks legitimate reasons for not pursuing such care. In such circumstances, a lack of additional mental health treatment cannot form a rational basis to discount either her reports or a consultant's opinions as her mental health conditions and their effects on her functional abilities. Thus, the court cannot find that

ALJ Willis's reasons for discounting Dr. Stack's findings and declining to adopt the limitations he assessed were reasonable. Accordingly, this issue warrants remand.

E.   **Residual Functional Capacity**

Willis's also argues that ALJ Willis erred in determining her RFC. Specifically, she contends that ALJ Willis's findings regarding her bilateral shoulder conditions and her CTS are not fully reflected in the RFC determination. The Commissioner contends that substantial evidence supports ALJ Willis's RFC findings, which properly reflect her limitations. The court finds that the RFC fails to reflect all of Willis's limitations stemming from her shoulder and CTS conditions.

The RFC is a determination, based on all the relevant medical and non-medical evidence, of what a claimant can still do despite her impairments; the assessment of a claimant's RFC is the responsibility of the ALJ. *See* 20 C.F.R. §§ 404.1520, 404.1545, 404.1546; SSR 96–8p, 1996 WL 374184, at *2. If more than one impairment is present, the ALJ must consider all medically determinable impairments, including medically determinable impairments that are not "severe," when determining the claimant's RFC. *Id.* §§ 404.1545(a), 416.945(a). The ALJ must also consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. *Id.* § 404.1523; *see Walker* v. *Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("[I]n evaluating the effect[] of various impairments upon a disability benefit claimant, the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them.").

The ALJ must provide "findings and determinations sufficiently articulated to permit meaningful judicial review." *DeLoatche* v. *Heckler*, 715 F.2d 148, 150 (4th Cir. 1983); *see also Wyatt* v. *Bowen*, 887 F.2d 1082, 1989 WL 117940, at *4 (4th Cir. 1989) (per curiam). The ALJ's

14

RFC determination "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." *Mascio* v. *Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Social Security Ruling ("SSR") 96–8p). Furthermore, "[t]he record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford* v. *Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Fourth Circuit precedent "makes it clear that it is not [the court's] role to speculate as to how the ALJ applied the law to [her] findings or to hypothesize the ALJ's justifications that would perhaps find support in the record. *Fox* v. *Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015).

Social Security Ruling 96–8p explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions" listed in the regulations. "Only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96–8p. The Ruling further explains that the residual functional capacity "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

There is no "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis[.]" *Mascio* v. *Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). However, "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in

15

the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki* v. *Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

In addressing the function-by-function assessment, or lack thereof, the Fourth Circuit's recent decision in *Monroe* v. *Colvin*, 826 F.3d 176 (4th Cir. 2016), is instructive. The Court of Appeals remarked that "expressing the RFC before analyzing the claimant's limitations function by function creates the danger that 'the adjudicator [will] overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do.'" *Id.* at 187–88 (quoting *Mascio*, 780 F.3d at at 636) (citation omitted). The *Monroe* Court concluded that the ALJ made such an error. *Id.* at 188. It observed that the ALJ found that Monroe's sleep apnea and narcolepsy were severe impairments, but made no specific findings about whether these conditions "would cause him to experience episodes of loss of consciousness or fatigue necessitating breaks in work and if so, how often these events would occur." *Id.* Instead, the ALJ simply concluded that Monroe was capable of a reduced range of light work and that his claimed symptoms were not credible to the extent they were inconsistent with the RFC. *Id.* Remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review[.]" *Id.* (quoting *Mascio*, 780 F.3d at 636).[4]

---

[4] The Fourth Circuit also determined that the ALJ failed to satisfactorily explain his decision to partly discredit the claimant's allegations. *Monroe*, 2016 WL 3349355, at *11. The court observed that the ALJ failed to indicate how the facts he cited discredit claimant's allegations that he would lose consciousness two or three times daily and suffered extreme fatigue. *Id.* Remand was appropriate because the ALJ failed to "build an accurate and logical bridge from the evidence to his conclusion that [claimant's] testimony was not credible." *Id.* at *10 (citation omitted).

Here, ALJ Willis's RFC determination fails to fully reflect Willis's physical limitations.[5] As noted above, the medical record as a whole demonstrates that Willis continued to report pain in her shoulders, arms, and hands. It also reveals that exam findings supported her complaints of pain and limitation. Moreover, objective testing through nerve conduction studies, x-rays, and MRIs showed objective evidence of impairment.

As noted above, a May 2009 NCS revealed severe right median neuropathy at her right wrist and mild median neuropathy on her left side. Tr. at 516. A July 2011 left shoulder MRI revealed subacromial narrowing and fairly pronounced tendonitis in the supraspinatus and insertion, thickening and edema along with potential adhesive capsulitis. *Id.* at 417. A left shoulder x-ray disclosed significant AC joint degenerative disc disease with inferior spur formation at the distal clavicle as well as a type III acromion suggesting impingement. *Id.* at 470. Providers diagnosed CTS and shoulder impingement with rotator cuff tendinopathy. *Id.*

Treatment notes from primary care providers reflect that Willis's shoulder pain was affecting her ability perform activities of daily living and examination demonstrated she had pain with ROM and positive impingement signs in her left shoulder and tenderness and decreased sensation in her right hand. *Id.* at 470, 528. In August 2011, Willis had CTS release surgery on her right wrist which provided only temporary relief. *Id.* at 472.

Willis continued to report left should pain an noted that it radiated through her arm and neck. *Id.* at 476–77, 482–83. With diagnoses of rotator cuff tendinopathy and left shoulder impingement, providers suggested her next course of action may be surgery as PT and injections had failed to provide long-lasting relief. *Id.* Records reflect that Willis continued to demonstrate

---

[5] As noted above, ALJ Willis's disability determination failed to properly address Willis's mental impairments and, accordingly, the RFC finding may also be inadequate with respect to her non-exertional limitations.

positive impingement signs upon examination. *Id.* at 484–85. Willis reported significant numbness and tingling in her right wrist, and providers opined she may have sustained chronic, long-term damage to her median nerve. *Id.* at 486–87.

An April 2013 left shoulder x-ray showed moderate AC joint damage. *Id.* In May 2013, an upper extremity nerve conduction study showed bilateral median neuropathy that was severe on the right side and moderate on the left side. *Id.* at 555–59.

Willis continued to pursue follow-up care for her bilateral wrist pain and, in May 2013, examination showed numbness and tingling consistent with median neuropathy. *Id.* at 488. Treatment notes also reflect that Willis's had severe median neuropathy on the right, which providers opined was primarily chronic nerve damage for which surgery would be of little benefit. *Id.* at 489.

In September 2013, Willis complained of decreased mobility, joint tenderness, and weakness in her shoulders, and providers assessed as a rotator cuff tear on the left side. *Id* at 561, 563. In October 2013, an examination revealed impingement signs on the right side, weakness with rotation, and pain with ROM. *Id.* at 672–73. Providers diagnosed her with a traumatic rotator cuff tear. *Id.* at 614. Although Willis underwent additional physical therapy in 2013, providers noted that her persistent shoulder pain kept her from tolerating the progression of treatment. *Id.* at 590, 607.

Although the ALJ found that Willis's testimony was not fully credible, it is consistent with the medical evidence showing her shoulder and CTS conditions limited her functional abilities. She reported having difficulty opening cans and lifting objects. She reported experiencing numbness, tingling, pain, and limited strength. She reported difficulty writing and holding utensils and dropped things.

Indeed, ALJ Willis found that her carpal tunnel syndrome and rotator cuff syndrome were severe impairments, meaning that these conditions had more than a minimal effect on Willis's ability to perform basic work activities. *Id.* at 22. Yet, despite this objective evidence of Willis's impairments, the RFC fails to reflect Willis's significant limitations in her upper extremities. The RFC contains a limitation to no more frequent use of of her upper extremities for exertional and manipulative tasks. *Id.* at 25. This could equate to using her upper extremities to push, pull, reach, handle, or finger for over five hours per day.[6] As the determination does not contain a function-by-function analysis of Willis's abilities to lift and carry or reach, handle, and finger, the court is uncertain whether these functions were adequately considered in light of her significant hand, arm, and shoulder conditions.

Although ALJ Willis noted the significant evidence of upper extremity impairment in his decision, the determination does not explain whether he found this evidence immaterial or unpersuasive. ALJ Willis's determination offers no reasons to discredit the medical findings with respect to her shoulder and CTS. As the Fourth Circuit noted, an ALJ should build a "logical bridge from the evidence to his conclusion[.]" *Monroe*, 826 F.3d at 189. ALJ Willis's decision does not show how an RFC for light work, which involves frequent lifting and carrying up to 10 pounds and occasional[7] lifting and carrying up to twenty pounds, is consistent with the medical evidence of Willis's upper extremity conditions and their resulting limitations. As ALJ Willis failed to connect the medical findings to the RFC through a logical bridge, as *Monroe* requires, remand is warranted.

---

[6] Under SSR 83-10, "frequent" is defined to mean occurring from one-third to two-thirds of the time. In an eight hour workday, this would be from 2.6 to 5.3 hours.

[7] Under SSR 83-10, "occasional" is defined to mean occurring up to one-third of the time. In an eight hour workday, this would be up to 2.6 hours.

19

**III.    Conclusion**

For the forgoing reasons, the court grants Willis's Motion for Judgment on the Pleadings (D.E. 20), denies the Berryhill's Motion for Judgment on the Pleadings (D.E. 22), and remands this matter to the Commissioner for further consideration.

Dated:  March 14, 2017

_____
Robert T. Numbers, II
United States Magistrate Judge